# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CYNTHIA A. CANNON, | : |
| Plaintiff, | : |
| v. | : C. A. No. 09-108-GMS |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security | : |
| Defendant. | : |

## MEMORANDUM

## I.    INTRODUCTION

This action arises from the initial denial of Cynthia Cannon's ("Cannon") claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act (the "Act") on May 21, 2007. 42 U.S.C. §§ 401-433m, 1381-1383f. Cannon applied for DIB and SSI on December 21, 2006, alleging her disability began on June 1, 2006 due to rheumatoid arthritis, low back pain, history of pericardial effusion, and depression and anxiety. (D.I. 13 at 88, 98.) After the Commissioner denied her application again on reconsideration, Cannon requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 64, 70.) Following the hearing, the ALJ issued a written opinion on October 28, 2008, denying Cannon's applications for DIB and SSI. (*Id.* at 11.) Specifically, the ALJ stated Cannon's impairments could reasonably produce her alleged symptoms, but found her testimony lacked credibility and was unsupported by the medical record. (*Id.* at 14, 16.) Additionally, the ALJ accorded "limited weight" to her treating physician, finding his

report was not substantiated by objective medical evidence, but instead relied on Cannon's subjective self-assessments. (*Id.* at 17.) Cannon requested a review of the ALJ's decision by the Social Security Appeals Council, which denied review on January 21, 2009. (*Id.* at 5-7.) On February 13, 2009, Cannon filed a timely appeal with this court. (D.I. 2.) Presently before this court are the parties' cross-motions for summary judgment. Because the court finds the ALJ's decision meets the substantial evidence test pursuant to 42 U.S.C. § 405(g), Cannon's motion is denied, the Commissioner's motion is granted, and the ALJ's decision is affirmed.

## II.   BACKGROUND

Cannon was born on April 24, 1965. (D.I. 13 at 88.) When she filed for DIB and SSI on December 21, 2006, Cannon was a forty-one year old female who was last employed as a housekeeper from January 2006 to August 2006. (*Id.* at 156-57.) Cannon's DIB and SSI claims stem from symptoms related to her rheumatoid arthritis, low back pain, history of pericardial effusion, and depression and anxiety, which have been coupled with more recent claims regarding genitourinary disorders and post-operative pain in her right foot. (D.I. 18.) Despite prescribed medications and physical therapy, Cannon claims she is still disabled under the Act. (D.I. 13 at 98.) To be eligible for DIB and SSI, Cannon must demonstrate she is disabled within the meaning of sections 216(i), 223(d), and 1614(a)(3)(A). (*Id.* at 11.)

### A.   Medical Evidence

To support her claim, Cannon produced her medical records regarding the history and alleged progression of her symptoms. The court will summarize these

2

records.

On February 17, 2004, Cannon had a total abdominal hysterectomy with anterior repair and experienced temporary urinary retention following surgery. (*Id.* at 190, 219-24.) Although her urinary retention resolved, Cannon also experienced post-operative pain in her right lower quadrant, which was likely due to her "known history of adhesive disease." (*Id.* at 190.) Cannon was treated with nonsteroidal anti-inflammatory agents for several months, but the pain was not responsive to drug therapy. (*Id.*) Despite Cannon's request for "definitive therapy" to alleviate the pain, the treating gynecologist, Dr. Calvin Wilson, indicated Cannon repeatedly changed her appointments due to "scheduling conflicts." (*Id.*) Ultimately, Cannon was admitted to the hospital for "an increase in pelvic pain" on December 7, 2004 and an exploratory laparotomy with right salpingo-oophorectomy[1] was performed. (*Id.* at 191.) At the time of surgery, Cannon took Vicodin and Celebrex for musculoskeletal pain. (*Id.* at 190.)

On August 18, 2006, a gastroenterologist, Dr. William Kaplan, performed an endoscopy and colonoscopy to investigate her complaints of abdominal pain, reflux symptoms, and weight loss. (*Id.* at 193.) The endoscopy results showed no abnormalities and Dr. Kaplan prescribed Prevacid to treat her nonerosive gastroesophageal reflux disease and possible irritable bowel syndrome. (*Id.*) The colonoscopy revealed small hemorrhoids for which a high-fiber diet was recommended. (*Id.*) Although a previous endoscopy performed on October 29, 2004 showed benign "tongues of gastric appearing mucosa . . . above the gastroesophageal junction" and

---

[1] Salpingo-oophorectomy is the removal of the ovary and its fallopian tube. *See* STEDMAN'S MEDICAL DICTIONARY (25th ed. 1990).

the presence of a hiatal hernia, there was no indication these symptoms recurred on August 18, 2006 or were present at her follow-up visit on September 27, 2006 (*Id.* at 195, 232.)

On October 4, 2006, Cannon was admitted to the emergency room for chest pain and difficulty breathing. (*Id.* at 197.) Cannon was discharged on October 5, 2006 after testing revealed normal heart and lung function. (*Id.*)

On November 9, 2006, Cannon consulted a rheumatologist, Dr. Maged Hosny, regarding lower back and right knee pain, which allegedly had been present for the past two years. (*Id.* at 298.) Believing "[t]he patient [wa]s more likely to have osteo[arthritis] than inflammatory arthritis," Dr. Hosny referenced previous x-rays of her cervical spine, lower back, and right foot, which showed osteoarthritis, and ordered bloodwork and additional x-rays of the spine, knees, shoulders, and hands to confirm his diagnosis. (*Id.* at 299.) At that time, she was taking the following medications: Vicodin, Prevacid, Lexapro, Docusate, and Cyclobenzaprine. (*Id.* at 298) Following that visit, Dr. Hosny continued the Vicodin and also prescribed Naprosyn. (*Id.* at 299.)

On November 21, 2006, Cannon returned to Dr. Hosny for an unscheduled follow-up visit, complaining of "acute flareup of pain in both elbows, knees, hands, [and] wrists" despite drug therapy. (*Id.* at 296.) Dr. Hosny changed his impression of Cannon's condition to "[i]nflammatory arthritis of multiple joints" due to Cannon's reported "flareup of her arthritis." (*Id.*) Stating he was "still in the process of ruling in or ruling out rheumatoid arthritis," Dr. Hosny prescribed Prednisone. (*Id.*)

On November 30, 2006, Cannon returned to Dr. Hosny. (*Id.* at 294.) At this

4

time, the doctor discontinued Prednisone despite noting some improvement in joint swelling, stiffness, and aching. (Id.) Following the discontinuance of Prednisone, Cannon experienced a "flareup" and, as a result, Dr. Hosny continued Naprosyn and Norco for pain, and also prescribed Enbrel. (Id.) Attributing both Cannon's improvement and subsequent flareup to the prescription of and removal from Prednisone, respectively, Dr. Hosny again revised his impression of Cannon's condition. (Id.) Notwithstanding the negative results of bloodwork for rheumatoid arthritis, lupus, and Lyme disease, Dr. Hosny determined Cannon "most likely" had rheumatoid arthritis. (Id.)

On January 23, 2007, she met with Dr. Hosny for a follow-up visit. (Id. at 291.) At this appointment, Dr. Hosny described Cannon as a "41-year old female diagnosed with rheumatoid arthritis," noting she reported "overall great improvement" with drug therapy, but had continued pain in her thumbs and lower back. (Id.) Dr. Hosny continued with the Enbrel, Norco, and Naproxen. (Id.) Additionally, Dr. Hosny released Cannon's medical records to the Delaware Department of Labor for use in its determination of her eligibility for unemployment insurance benefits. (Id. at 292.)

On February 14, 2007, Cannon consulted a urologist, Dr. Delbert J. Kwan, for urinary frequency. (Id. at 215.) Dr. Kwan noted Cannon's genitourinary exams were normal and recommended a cystoscopy and other routine testing be performed. (Id. at 218.)

On February 21, 2007, Dr. Kaplan saw Cannon for a follow-up appointment regarding the endoscopy performed on August 18, 2006. (Id. at 231.) Although Dr.

Kaplan noted Cannon's dyspepsia continued, he stated it had "not progressed and [was] relatively mild." (*Id.*) Dr. Kaplan also expressed frustration regarding Cannon's history of noncompliance, as confirmed in her medical records since November 2001. (*Id.* at 231-38.)

On March 13, 2007, Cannon sought treatment for persistent pain in her left lower quadrant and dyspareunia.[2] (*Id.* at 211.) Assessed as having adhesive disease, dyspareunia, and a left ovarian cyst, a left salpingo-oophorectomy was performed. (*Id.* at 214.)

On March 20, 2007, Cannon returned to Dr. Hosny for an "acute flare up of RA," which required reinstating a high dose of Prednisone. (*Id.* at 290.) At this time, Cannon was taking Enbrel, Naprosyn, Norco, Prevacid, and Flexeril. (*Id.*) Dr. Hosny noted she would be tapered off Prednisone, while continuing the other medications. (*Id.* at 215.)

On April 7, 2007, Dr. R. Palandjian assessed Cannon's physical residual functional capacity ("RFC"). (*Id.* at 248-53.) After evaluating Cannon's exertional, postural, manipulative, visual, communicative, and environmental limitations, Dr. Palandjian noted there were "treating/examining source conclusions about the claimant's limitations or restrictions which [were] significantly different from [his] findings." (*Id.* at 252.) Specifically, Dr. Palandjian noted Dr. Hosny's diagnosis of total disability was an "opinion reserved for the commissioner." (*Id.*) Additionally, Dr. Palandjian identified inconsistencies between Cannon's medical reports and her complaints, concluding she was "partially credible." (*Id.* at 253.) Dr. Palandjian found

---

[2] Dyspareunia is the occurrence of pain during sexual intercourse. *See* STEDMAN'S MEDICAL DICTIONARY (25th ed. 1990).

6

Cannon capable of light activity "[b]ased upon the lack of complications from her pericardial effusion, lack of joint deformity, and independent gait." (*Id.*)

On April 23, 2007, Cannon consulted Dr. Kartik Swaminathan, a pain specialist, for her lower back. (*Id.* at 335-39.) At this time, Cannon indicated she was taking the following medications: Tramadol, Flexeril, Percocet, Vicodin, Ducosate Sodium, Prevacid, and Lexapro. (*Id.* at 336-37.) Dr. Swaminathan continued the Percocet, and also prescribed Zanaflex and Naprosyn. (*Id.* at 331-32.)

On May 1, 2007, Dr. Janis Chester performed a psychiatric examination of Cannon for the Delaware Disability Determination Service. (*Id.* at 264.) During this examination, Dr. Chester evaluated Cannon's psychiatric, medical, and family and social history as well as her current mental status. (*Id.* at 264-66.) According to Dr. Chester's report, Cannon's primary care physician prescribed Lexapro approximately two weeks prior to this appointment. (*Id.* at 264-65.) Although Cannon reported a history of depression, Dr. Chester noted Cannon only recently initiated treatment with Mr. Patrick Casey, a counselor at Delaware Guidance Services. (*Id.* at 265.) Dr. Chester found no history of psychosis or mania, but documented Cannon's reported history of crack cocaine abuse, which began as a teenager and continued until age thirty-five. (*Id.*) Dr. Chester also summarized Cannon's medical and treating physicians' findings, previous surgeries, and current medications. (*Id.*) Dr. Chester noted, however, that Dr. Hosny's diagnosis of rheumatoid arthritis was not corroborated by Cannon's bloodwork, but would "entertain" a diagnosis of rheumatoid arthritis based upon Cannon's history of heart disease and arthritis. (*Id.*) Further, Dr. Chester noted

7

she was able to care for her six children "to some degree." (*Id.* at 266.) Additionally, Dr. Chester reported Cannon graduated high school, received a degree from a technical college, and last worked in June 2006. (*Id.*) Finally, Dr. Chester evaluated Cannon's current mental health status, noting she was "engageable," "alert and oriented," "her mood [wa]s irritable[,] and her affect [wa]s full range." (*Id.*) Dr. Chester found Cannon's "insight and judgment . . . intact." (*Id.*) In addition to a narrative report, Dr. Chester also completed a supplemental questionnaire regarding Cannon's RFC, indicating her symptoms and impairments ranged from mild to moderate. (*Id.* at 268-69.)

On May 3, 2007, Cannon sought treatment from Dr. Hosny for pain, swelling, and stiffness following the discontinuation of Prednisone. (*Id.* at 289.) Feeling she was not well-controlled on Enbrel and deciding not to reintroduce Prednisone, Dr. Hosny started her on Remicade infusion. (*Id.*)

On May 10, 2007, Dr. Swaminathan saw Cannon regarding her back pain. (*Id.* at 325-28.) Although Dr. Swaminathan indicated her mood was normal, not depressed or anxious, Cannon complained her low back pain had worsened. (*Id.* at 325, 327.) As a result, Dr. Swaminathan continued the same pain medications and prescribed physical therapy. (*Id.* at 326, 328.)

On May 17, 2007, Dr. Douglas Fugate prepared a psychiatric review, which assessed Cannon's medical disposition. (*Id.* at 272-82.) Accordingly, Dr. Fugate found her medical disposition consisted of "[c]oexisting [n]onmental [i]mpairment(s)" based on her affective disorder and history of substance abuse. (*Id.* at 273.) Dr. Fugate

8

diagnosed "[d]epression secondary to chronic pain" and in remission for cocaine abuse. (*Id.* at 275, 278.) Similar to Dr. Chester, Dr. Fugate found the degree of Cannon's functional limitations to range from mild to moderate. (*Id.* at 280.) In addition to the psychiatric review, Dr. Fugate performed a mental RFC, in which he concluded her understanding and memory, sustained concentration and persistence, social interaction, and adaptation were either "[n]ot [s]ignificantly [l]imited" or "[m]oderately [l]imited." (*Id.* at 283-85.) Dr. Fugate noted Cannon had no history of psychiatric treatment until recently, her mental exam was within normal limits, and she was "able to meet the basic mental demands of simple work." (*Id.* at 285.)

On May 29, 2007, Cannon saw Dr. Hosny at an unscheduled visit for "pain of 2-days duration." (*Id.* at 288.) Her first Remicade infusion occurred two days prior. (*Id.*) To treat her "acute rheumatoid flare," Dr. Hosny prescribed Methotrexate and folic acid in addition to continuing the Remicade. (*Id.*)

On June 28, 2007, Cannon returned to Dr. Hosny for another unscheduled visit regarding pain in her right foot. (*Id.* at 287.) Dr. Hosny noted Cannon had a ganglion cyst removed from her right foot and determined her pain was unrelated to rheumatoid arthritis. (*Id.*) Dr. Hosny advised Cannon to schedule an appointment with Dr. Kahn and increased the dosage of her next Remicade infusion. (*Id.*)

On July 16, 2007, Dr. Swaminathan conducted a spinal evaluation. (*Id.* at 301-04.) He diagnosed Cannon with low back pain and mild scoliosis, but found she would "return to normal home activities" with the assistance of a prescribed treatment plan and medications. (*Id.* at 303.) On July 25, 2007, however, Cannon's physical therapist

9

contacted Dr. Swaminathan's office, advising Cannon discontinued physical therapy. (*Id.* at 306.) The therapist advised Cannon only attended two of her four scheduled visits, and "goals were not met secondary to her noncompliance with her plan of care." (*Id.* at 688.) Despite Cannon's noncompliance with physical therapy, Dr. Swaminathan continued to prescribe pain medications at the following office visits: November 6, 2007; January 22, 2008; March 18, 2008; April 29, 2008; May 27, 2008; and June 17, 2008. (*Id.* at 698, 700, 704, 708, 710, 714.)

On November 27, 2007, Dr. Paul Falden performed a left anterolateral thoracotomy with pericardial window to alleviate Cannon's pericardial effusion, for which she was previously treated in 2002 by Dr. Alexander. (*Id.* at 265, 475, 579.) At the time of the surgery, Cannon was taking folic acid, Naprosyn, Methotrexate, Ducosate, Prevacid, Oxycodone, Remicade, Oxytrol, and Gabapentin. (*Id.* at 509.) Following her cardiac surgery, Cannon was also prescribed Percocet. (*Id.*) On January 1, 2007, Cannon was discharged in stable condition with "no pericardial effusion of significance." (*Id.* at 520-25.)

On January 16, 2008, Dr. Hosny ordered bloodwork to test for rheumatoid arthritis. (*Id.* at 583-89.) Although Cannon's initial blood chemistry indicated a slightly positive result of a rheumatoid factor of 11 (reference range < 14), further bloodwork performed on January 26, 2008 returned a higher, positive result of 15 (same reference range). (*Id.* at 585, 594.)

On January 16, 2008, Gwyn Stup, A.P.R.N., treated Cannon for depression and anxiety. (*Id.* at 660-63.) Although Stup initially prescribed Cymbalta, Cannon

10

complained she could not tolerate the medication, and was switched to Celexa on February 18, 2008. (*Id.* at 664.) Despite finding Cannon experienced moderate symptoms or difficulties, Stup changed Cannon's medication again on April 21, 2008 to Lexapro. (*Id.* at 665.)

On March 21, 2008, Dr. Jacob Hanlon performed a plantar fasciotomy on Cannon's right foot to remove dense, fibrous tissue, which was causing her chronic right foot pain. (*Id.* at 577.) Nothing in the medical records suggests Cannon suffered any complications from this surgery. (*Id.* at 596.)

At the time of the hearing, Cannon's medications included: Prevacid 30 mg two times daily, Lexapro 10 mg daily, Hydroxychloroquine 200 mg daily, Oxycodone Apa 5-325 mg once every 6 hours; Cyproheptadine 4 mg daily, Docusate Sodium 100 mg two times daily, Prednisone 10 mg daily, Methotrexate 25 mg daily, Colchicine 0.6 mg daily; Tizanidine HCL 4 mg at bedtime, folic acid 1 mg daily, Remicade, and Oxytrol 3.9 mg 24-hour patch. (*Id.* at 188.)

**B.    Hearing Testimony**

1.    *Cynthia Cannon's Testimony*

Cannon testified she was born on April 24, 1965 and was currently forty-three years old. (*Id.* at 30.) Cannon stated she graduated from high school, previously worked as a child care provider, and currently lived with five of her six children. (*Id.* at 30-31.) To support her family, Cannon acknowledged she received cash assistance and child support, and one of her sons received disability. (*Id.* at 32.) She had been unemployed for the past three years because of problems with her hands, feet, and

11

back and hips. (Id. at 30.) Although Cannon claimed these problems began shortly after her hysterectomy, she later testified the back and hip pain originated seven years prior and her foot had bothered her since high school. (Id. at 30, 35, 36.) Further, she took Oxycodone for the past seven years for back and hip pain. (Id. at 35.)

According to Cannon, she underwent pericardial effusion surgery twice, and for the past five to six years suffered from an overactive bladder. (Id. at 30-31, 41.) Additionally, Cannon stated her rheumatoid arthritis required her to wear a brace on her right hand, precluded her from lifting, and necessitated assistance from her children. (Id. at 27-29.) Cannon explained she had difficulty walking and standing due to hip and back problems and recent foot surgery, but she did not use a cane or back brace for support. (Id. at 27-28, 45.) She claimed continued foot pain despite recent plantar faciitis surgery. (Id. at 28.) As a result, she was unable to stand on her feet no longer than fifteen to thirty minutes. (Id.) Cannon claimed difficulty sitting because of spasms in her back, for which Dr. Swaminathan recently prescribed muscle relaxers. (Id. at 27-29.)

Aside from her physical ailments, Cannon testified she was "down in the dumps" and currently taking Lexapro for her depression and anxiety. (Id. at 29, 35.) Additionally, Cannon stated she spent the majority of her day watching television or sleeping, but would use public transportation to attend doctors' appointments. (Id. at 32-33.) Further, Cannon was reluctant to acknowledge her history of past cocaine abuse. (Id. at 33.)

2.    The Vocational Expert's Testimony

The vocational expert ("VE"), Christina Beatty-Cody, also testified. (*Id.* at 44-48.) Beatty-Cody classified Cannon's past work as a child care provider and commercial cleaner as light exertional level and medium exertional level, respectively. (*Id.* at 44.)

In the hypothetical proposed by the ALJ, Beatty-Cody was asked to assume whether a younger individual with a high school education, past relevant work history similar to that of Cannon, and all symptoms and limitations claimed by Cannon at the hearing was capable of any jobs. (*Id.* at 46.) The VE responded such a hypothetical individual could not perform any work. (*Id.*)

In the alternative hypothetical, the VE was instructed to apply the same vocational factors, but assume whether the hypothetical individual was capable of performing sedentary work with the following conditions: "a sit/stand option," work limited to "simple, routine tasks," and occasional "use of the upper extremities in such activities as handling, fingering, [and] reaching." (*Id.* at 47.) The VE opined such an individual was capable of performing the following sedentary jobs: (1) a surveillance system monitor; and/or (2) a type copy examiner. (*Id.*)

## C. The ALJ's Findings

Under the Social Security Act, the Social Security Administration employs the following five-step sequential claim evaluation process to determine whether an individual is disabled:

[The Commissioner] determines first whether an individual is currently engaged in substantial gainful activity. If that individual is engaged in substantial gainful activity, he will be found not disabled regardless of the medical findings. 20 C.F.R. § 404.1520(b). If an individual is found not to be engaged in substantial gainful activity, the [Commissioner] will determine whether the medical evidence indicates that the claimant

13

suffers from a severe impairment. 20 C.F.R. § 404.1520(c). If the [Commissioner] determines that the claimant suffers from a severe impairment, the [Commissioner] will next determine whether the impairment meets or equals a list of impairments in Appendix I of sub-part P of Regulations No. 4 of the Code of Regulations. 20 C.F.R. § 404.1520(d). If the individual meets or equals the list of impairments, the claimant will be found disabled. If he does not, the [Commissioner] must determine if the individual was capable of performing in his past relevant work considering his severe impairment. 20 C.F.R. § 404.1520(e). If the [Commissioner] determines that the individual is not capable of performing his past relevant work, then he must determine whether, considering the claimant's age, education, past work experience and residual functional capacity, he is capable of performing other work which exists in the national economy. 20 C.F.R. § 404.1520(f).

West v. Astrue, No. 07-158, 2009 WL 2611224, at *5 (D. Del. Aug. 26, 2009) (quoting

Brewster v. Heckler, 786 F.2d 581, 583-84 (3d Cir. 1986)). Based on the factual

evidence and testimony of Cannon and the VE, the ALJ determined Cannon was not

disabled and, therefore, not eligible for DIB or SSI. (D.I. 13 at 11.) The ALJ's Findings

are summarized as follows:

1.  The claimant meets the insured status requirements of the Social Security Act as of her alleged onset date and continued to meet them through March 31, 2008.

2.  The claimant has not engaged in substantial gainful activity at any time since June 1, 2006, the alleged disability onset date (20 CFR 404.1520(b), 404.1571, et seq.; 416.920(b) and 416.971, et seq.).

3.  The claimant has the following severe impairments: rheumatoid arthritis; low back pain; residuals of recent foot surgery; history of cardiac disorder; and depression associated with anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary

14

work activity (*i.e.*, work that involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools, and requires only limited walking and standing). The claimant can perform manipulative activities such as handling, fingering, and reaching frequently or occasionally, but not constantly. She is limited to jobs that permit the individual to alternate between sitting or standing during the course of the workday as desired, and that involve only simple, routine, tasks (20 CFR 404.1567(a), 416.967(a)).

6. The claimant cannot perform her past relevant work as it requires the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 24, 1965, and is 43 years old, which is defined as a "younger person" (20 CFR 404.1563 and 416.963).

8. The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. The issue of transferability of work skills is not material to this decision due to the claimant's age and residual functional capacity (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are a significant number of jobs that exist in the regional and national economy that she can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been disabled within the meaning of the Social Security Act at any time from June 1, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)). (*Id.* at 13-18).

## III.   STANDARD OF REVIEW

### A.   Motion for Summary Judgment

The parties cross moved for summary judgment pursuant to Fed. R. Civ. P.

56(c). (D.I. 18, 19.) In determining the appropriateness of summary judgment, a court

must review the record as a whole and "draw all reasonable inferences in favor of the

nonmoving party, [but refrain from making] credibility determinations or weigh[ing] the

evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)

15

(citations omitted). If a court determines "'there is no genuine issue as to any material fact' and . . . the movant is entitled to judgment as a matter of law," then summary judgment is appropriate. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

## B. Review of the ALJ's Findings

In social security cases, the substantial evidence standard applies to motions for summary judgment. *See Woody v. Sec'y of the Dep't of Health and Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988). Specifically, a reviewing court must uphold factual decisions if they are supported by "substantial evidence." 42 U.S.C. § 405(g), 1383(c)(3). "Substantial evidence means less than a preponderance of the evidence, but more than a mere scintilla of evidence. . . ." *Lilly v. Astrue*, No. 10-30-LPS/MPT, 2012 WL 256634, at *6 (D. Del. Jan. 30, 2012) (quoting *Rutherford v. Barnhard*, 399 F.3d 546, 552 (3d Cir. 2005)). Stated alternatively, substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Although a reviewing court is limited to the evidence presented to the ALJ, "[c]redibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)). Even if a reviewing court would reach a different conclusion, the ALJ's decision warrants deference if it is supported by substantial

16

evidence. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986). Therefore, the focus of the inquiry is not whether this court "would have made the same determination, but rather, whether the ALJ's findings were reasonable." *Lilly*, 2012 WL 256634, at \*7 (citing *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988)).

## IV. DISCUSSION

After considering the record in this case, the parties' submissions and arguments, and the applicable law, the court concludes the ALJ's decision is supported by substantial evidence. Specifically, the court finds the ALJ was reasonable in his apportionment of weight to the medical opinion evidence and evaluation of Cannon's credibility. Therefore, the court will: (1) deny plaintiff's motion for summary judgment; and (2) grant defendant's motion for summary judgment.

### A. Treating Physician's Medical Opinion

A treating physician's written report setting forth medical findings in the physician's area of competence "may constitute substantial evidence." *Richardson v. Perales*, 402 U.S. 389, 402 (1971). In determining the proper weight to give such medical opinions, the ALJ is required to weigh all evidence and resolve any material conflicts. *See id.* at 399. According to the Third Circuit, "[t]reating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)). Although a treating physician's opinion may be "entitled to substantial and at times controlling weight," it is only accorded

"controlling weight" if it "is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ, however, may reject a treating physician's opinion if it based on contradictory medical evidence. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted). Alternatively, an ALJ may choose not to accord a treating physician's opinion controlling weight if contradictory medical evidence is present; nevertheless, "the ALJ must still carefully evaluate how much weight to give the treating physician's opinion." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008). Because "[t]reating source medical opinions are still entitled to [some] deference," the ALJ must weigh them "using all of the factors provided in 20 C.F.R. 404.1527 and 416.927." Social Security Regulation 96-2p, 1996 WL 374188, at *4 (July 2, 1996).

An ALJ may not disregard a treating physician's medical opinion "based solely on his own 'amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility.'" *Morales*, 225 F.3d at 318 (alteration in original) (quoting *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)). Further, the ALJ must provide an explanation "for a rejection of probative evidence which would suggest a contrary disposition." *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (citing *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986)). Although some evidence may be appropriately considered while the rest is ultimately rejected, the ALJ must consider all evidence and provide a rationale for evidence that is rejected. *See Stewart v. Sec'y of*

18

*H.E.W.*, 714 F.2d 287, 290 (3d Cir. 1983).

Here, the court finds the weight apportioned by the ALJ to Dr. Hosny's opinion is based on substantial evidence in the record. In according "limited weight" to his opinion, the ALJ found certain findings consistent with the record. (D.I. 13 at 16-17.) Specifically, the ALJ stated "the claimant's medically determinable impairments could reasonably be expected to produce her alleged symptoms . . . ." (*Id.* at 16.) However, the ALJ found Dr. Hosny's assessment of Cannon's "physical functional limitations with respect to exertional and postural activities . . . to be based heavily on the claimant's subjective complaints rather than the results of her physical examinations or other objective medical evidence." (*Id.* at 17.) Further, the ALJ found "the claimant's medical treatment and mental health treatment consistent with a conclusion that she experience[d] only moderate physical and mental limitations and remain[ed] capable of performing non-strenuous, simple, routine jobs." (*Id.*) Because Dr. Hosny overstated the degree of Cannon's limitations, the ALJ accorded "limited weight" to his opinion. (*Id.* at 16-17.)

The court disagrees with Cannon's claim that the ALJ erred when he did not afford Dr. Hosny's opinion "great weight." (D.I. 18 at 16.) Dr. Hosny's opinion is entitled to controlling weight if supported by medical evidence and consistent with the record. In light of conflicting, objective medical testing and inconsistencies within the record, the ALJ was entitled to reject Dr. Hosny's findings regarding the extent of Canon's limitations.

First, Dr. Hosny's opinion is inconsistent with the medical evidence on record, which documented the mild to moderate range of her symptomatology and success of

19

drug therapy. Medical evidence from other treating doctors indicates the following: (1) Cannon has normal genitourinary function; (2) she is capable of light activity; (3) her diagnosed rheumatoid arthritis is not corroborated by bloodwork; (4) Cannon's functional limitations range from mild to moderate; (5) a treatment plan and medication would enable her to return to normal activities; (6) she does not suffer from post operative complications from pericardial effusion surgery; and (7) Cannon does not suffer from post operative complications from plantar faciitis surgery. (D.I. 13 at 218, 253, 265, 280, 303, 520-25, 596.)

Second, Dr. Hosny's opinion is inconsistent with his own treatment history. Throughout his treatment notes, Dr. Hosny indicated the following: (1) he could not confirm a consistent diagnosis, oscillating from osteoarthritis to inflammatory arthritis to rheumatoid arthritis; (2) Cannon's bloodwork did not support a diagnosis of rheumatoid arthritis; (3) her pain improved with drug therapy; and (4) Cannon's most recent pain was unrelated to rheumatoid arthritis. (Id. at 287, 291, 294, 296, 299.) Yet, on July 8, 2008 and again on January 18, 2010, Dr. Hosny, in answering a questionnaire regarding Cannon's ability to do work-related activities on a day-to-day basis, listed limitations that effectively rendered her totally disabled. (Id. at 715-17; D.I. 18-1.) However, Dr. Hosny did not provide any notes or comments even where a further explanation was required. (D.I. 13 at 715-17.) Additionally, Dr. Hosny did not indicate he observed any objective evidence of Cannon's self-reported pain. (Id. at 717.) Because Dr. Hosny merely created a checklist of Cannon's limitations without any substantiating support from either her medical records or his objective observations, Dr. Hosny's determination of Cannon's total disability is not entitled to deference.

Decisions regarding disability are reserved for the Commissioner and must be weighed in light of credibility determinations and the claimant's history of noncompliance. *See* 20 C.F.R. § 404.1527(e)(1); *Reynolds v. Astrue*, No. 10-356-LPS/MPT, 2011 WL 2708720, at *8 (D. Del. July 12, 2011).

Third, Dr. Hosny's opinion is also inconsistent with Cannon's daily activities. In addition to caring for her children, Cannon does household chores, uses public transportation, and attends church. (D.I. 13 at 126-33.) Such a level of daily activity is inconsistent with a person who is totally disabled. As a result, the ALJ's allocation of limited weight to Dr. Hosny's opinion is supported by substantial evidence.

Further, in assigning limited weight to Dr. Hosny's findings, the ALJ is required to consider all evidence and provide an appropriate explanation. Here, the ALJ evaluated the record and Cannon's hearing testimony before concluding Dr. Hosny's opinion was inconsistent with the other medical evidence on record. (*Id.* at 17.) Because the ALJ determined Cannon's testimony and self-assessments lacked credibility and noted, in turn, Dr. Hosny heavily relied upon her subjective complaints to form his assessment, the ALJ was entitled to assign limited weight to Dr. Hosny's opinion. (*Id.*) Therefore, the ALJ satisfied his burden of conducting a thorough evaluation and providing appropriate explanations.

## B. Evaluation of Cannon's Symptoms and Noncompliance

In evaluating symptoms, the ALJ must "consider all . . . symptoms, including pain." 20 C.F.R. § 404.1529(a). Also, the ALJ must consider whether such symptoms "can reasonably be accepted as consistent with the objective medical evidence and

21

other evidence." *Id.* After determining an impairment "could reasonably be expected to produce . . . symptoms, such as pain," the "intensity and persistence" must be assessed to ascertain the limitations on one's ability to work. 20 C.F.R. § 404.1529(c). To assist with this determination, the following, non-exhaustive factors are considered: (1) "objective medical evidence;" (2) "daily activities;" (3) "location, duration, frequency, and intensity;" (4) medication prescribed, including its effectiveness and side effects; (5) treatment; and (6) other measures to relieve pain. *Id.*

Here, the court finds the ALJ's analysis of Cannon's pain is reasonable. First, the ALJ concluded Cannon's "medically determinable impairments could reasonably be expected to produce her alleged symptoms." (D.I. 13 at 16.) However, the ALJ determined "her statements concerning the intensity, duration and limiting effects of these symptoms [were] not entirely credible." (*Id.*) In assessing Cannon's credibility, the ALJ evaluated the record as a whole. (*Id.*)

The court disagrees with Cannon's allegation that the ALJ failed to support his credibility determination with substantial evidence. (D.I. 18 at 16.) The ALJ included Cannon's alleged symptoms and limits in the hypothetical questions posed to the VE. (D.I. 13 at 46-47.) Although this court acknowledges Cannon's complaints of pain throughout the record, multiple contradictions exist in the record, which provide substantial evidence supporting the ALJ's evaluation of Cannon's symptom severity.

First, the purported severity of her symptoms is inconsistent with Cannon's daily activities. As previously discussed, Cannon cares for her six children, does household chores, uses public transportation, and attends church. (*Id.* at 126-33.) Although she testified about multiple limitations in her daily activities, the extent of her abilities

22

contradict her contentions of debilitating pain and total inability to work.

Second, Cannon's alleged acute and chronic symptomatology is inconsistent with the success of her surgical procedures and drug therapy. Regarding her rheumatoid arthritis, Cannon testified her hands were swollen and prevented her from working. (Id. at 28, 39.) Medical testing, however, did not strongly support a diagnosis of rheumatoid arthritis. (Id. at 265, 294.) Independent of the proper diagnosis and contrary to Cannon's testimony, the medical record reveals her arthritic symptoms improved significantly with drug therapy. (Id. at 35, 291.) Additionally, Cannon testified she continued to have problems with her foot despite having plantar faciitis surgery and wearing inserts. (Id. at 28.) Nevertheless, the medical record reveals the dense, fibrous tissue that was causing her chronic right foot pain was removed, and there were no indications she suffered any post-operative complications. (Id. at 577, 596.) Further, Cannon testified her foot, back, and hip pain caused her to suffer problems with walking and standing. (Id. at 27.) Medical evidence, however, indicates her low back pain and mild scoliosis would not preclude her from participating in daily activities so long as she took medication and adhered to a prescribed treatment plan. (Id. at 303.) Regarding her depression and anxiety, Cannon testified she was "down in the dumps" and currently taking Lexapro. (Id. at 29, 34.) Nevertheless, the medical record indicates Cannon only recently sought psychological treatment and was still capable of "meet[ing] the basic mental demands of simple work." (Id. at 285.) Cannon also testified about her overactive bladder. (Id. at 41.) The medical evidence, however, does not indicate this condition required frequent medical attention or is not well-

23

controlled by medication. Regarding Cannon's pericardial infusion, the medical record does not suggest she continues to suffer residual effects following her surgery. (*Id.* at 253, 520-25.) Therefore, significant evidence in the record reveals Cannon's impairments are under control or amenable to treatment.

Third, the purported intensity of her symptoms is further complicated by Cannon's persistent noncompliance. To obtain medical benefits, a claimant "must follow treatment prescribed by . . . [a] physician if . . . [that] treatment can restore . . . [the claimant's] ability to work." 20 C.F.R. § 404.1530. As noted previously, the record shows a history of failure to maintain office visits, seek follow-up treatment, and abide by her prescribed treatment regimen. (D.I. 13 at 190, 231-38, 688.) Cannon's failed adherence to her treatment plan, therefore, undermines her credibility and permits the ALJ to accord her testimony only "some weight." (*Id.* at 16) As manifested by Cannon's daily activities, success through surgical intervention and drug therapy, and history of noncompliance, the ALJ's evaluation of her symptorns is supported by substantial evidence in the record.

## C.    Determination of RFC and Evaluation of Limitations

In making a RFC determination, all evidence must be considered. *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted). Although the ALJ can make credibility determinations, a reason must be provided for rejecting specific evidence. *Id.* (citations omitted).

Here, the ALJ determined Cannon's RFC authorized sedentary work with specific limitations for sitting, standing, handling, fingering, and reaching. (D.I. 13 at 18, 47.) In

reaching this conclusion, the ALJ noted medical evidence and opinion testimony were considered. (*Id.* at 18.)

First, as previously stated, a thorough evaluation was conducted regarding medical opinions, symptom evaluation, and treatment noncompliance. In conducting his assessment, the ALJ provided explanations for rejecting evidence as lacking credibility. In light of the ALJ's thorough evaluation, the RFC is based on substantial evidence in the record.

Second, contrary to Cannon's alleged total disability, the RFC permits her to perform restricted sedentary work. (*Id.*) In establishing the appropriate RFC, the ALJ noted Cannon's limitations, which would preclude her from performing all the requirements of every sedentary position. (*Id.*) Therefore, in determining job availability, the ALJ relied on the VE's expertise and testimony addressing the existence of such sedentary work in the national and regional economy. (*Id.* at 17-18.)

## D. Vocational Expert Testimony of Available Work

Hypothetical questions proposed to the VE need only reflect the impairments supported by the record. *See McDonald v. Astrue*, 293 F. App'x 941, 946-47 (3d Cir. 2008). When a hypothetical is accurately presented, the VE's response thereto constitutes substantial evidence. *See id.* at 947 (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)). Stated alternatively, a VE's testimony is only valid when based upon a hypothetical question that accurately reflects a claimant's physical and mental limitations. *See Myers v. Comm'r of Soc. Sec.*, 340 F. App'x 819, 821 (3d Cir. 2009) (citing *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)).

Here, the ALJ's hypothetical questions to the VE included Cannon's age, education, work history, symptoms, and limitations. (D.I. 13 at 17-18.) In response, the VE noted available jobs in the sedentary category. (*Id.* at 47.) Because the Dictionary of Occupational Titles does not address a sit/stand option, one of Cannon's limitations, the VE included this option as well as several other provisos in her analysis. (*Id.*) As previously stated, the ALJ's evaluation of Cannon's symptom severity is supported by substantial evidence in the medical record and, therefore, the hypothetical question was accurate. Accordingly, the VE's testimony constitutes substantial evidence, which supports the ALJ's determination that Cannon is not disabled and is capable of performing other available work. *See* 20 C.F.R. § 404.1520(g).

## V.    CONCLUSION

For the aforementioned reasons, the court concludes the following: (1) the ALJ's denial of DIB and SSI is based on substantial evidence; (2) Cannon's motion for summary judgment is denied; and (3) the Commissioner's motion for summary judgment is granted.

Dated March *3*, 2012

CHIEF, UNITED STATES DISTRICT JUDGE

26

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CYNTHIA A. CANNON, | : |
| Plaintiff, | : |
| v. | : C. A. No. 09-108-GMS |
| MICHAEL J. ASTRUE, Commissioner of Social Security | : |
| Defendant. | : |

## ORDER

For the reasons set forth in the Memorandum issued on this date,

**IT IS HEREBY ORDERED** this ___/ 3<sup>t 7</sup>___ day of ___Muh___, 2012,

that

(1) Plaintiffs's motion for summary judgment (D.I. 18) is DENIED; and

(2) Defendant's motion for summary judgment (D.I. 19) is GRANTED.

CHIEF, UNITED STATES DISTRICT JUDGE